Mr. Shemugan, did I say that right? Yes, thank you, Judge Larkin. Kenneth Shemugan, I'm a Paul Weiss for the appellant, Ryan Gilbertson. May it please the Court. Mr. Gilbertson's convictions under the federal criminal fraud statute should be reversed on two grounds. First, legitimate open market trades that are executed at prevailing market prices do not communicate inaccurate information to the market and therefore cannot constitute market manipulation as a matter of law. And second, the government failed to present any part of a manipulative scheme? No, Your Honor, which is to say that market manipulation focuses on the relevant market activity. There's no disagreement between us and the government about the standard that the Supreme Court has established for market manipulation. The definition is whether or not the activity on the market is, quote, designed to deceive or defraud investors by controlling or artificially affecting the price of securities. The critical fact for purposes of market manipulation is that there has to be some artificial or inaccurate information that is communicated to the market, either by a representation or by the activity in question. And the problem with the government's theory in this case is that the government does not, before this court, attempt to make any argument that these were somehow sham trades like wash sales or match trades and the like. The government's theory instead seems to be a theory of price inflation or maintenance. But the problem is that the government made no effort to present any evidence at trial regarding the price movements to actually show that the price would have been lower absent this activity and that artificial information was communicated to the market. And indeed- Does this argument address only the securities fraud conviction? No, I think it goes to wire fraud. You can't narrow the wire fraud that way. Well, it goes to wire fraud, Judge Loken, because the charge scheme for both the securities fraud and the wire fraud was market manipulation. And if you take a look- Wait, wait, wait. The charge scheme. Now you're talking about the indictment language or the government's opening or its closing? Well, I would go right actually to the jury's instructions, Judge Loken, at pages 32 and 34 of the addendum. And with regard to both the scheme to defraud for purposes of the wire fraud statute and the manipulative or deceptive device for purposes of securities fraud, it's quite clear that the relevant scheme was the market manipulation, and in particular the manipulation of the market during the first 20 days of trading. And so, Judge Loken, if you look at- I just don't see how you can constrict the broad prime of wire fraud that way. I don't think we are in any way constricting the definition of wire fraud. My point is simply that the relevant scheme that was instructed here is the scheme to manipulate the market, and I don't read the government to be suggesting otherwise. I think the government concedes that it has to establish market manipulation. And because the government makes no effort to suggest that there were sham trades or anything like that, it has to fall back on a theory of price inflation or maintenance. But again, the problem is that the government made no effort, even through its expert, to present evidence with regard to these price movements, and the uncontroverted evidence indicated that these trades were taking place on the open market. They were taking place at market prices. The vast majority of Shermeta's purchases, which is really the conduct that could potentially inflate the price, took place at or actually below the price of preexisting trades. And again, the government has to show something more than that. And I would just say- sorry, Judge Kelly, it looked like you had a question, but I just want to say one other thing on this. I think that the danger with the government's theory, and I think it's a danger with which this Court should be very concerned, is the danger that if you adopt a standard that suggests that merely encouraging someone to purchase stock constitutes market manipulation, that would allow the government to prosecute no end of corporate officers and others based solely on an allegation that the officer was acting out of a profit motive. And I would respectfully submit- I'd agree with you if our opinion said that. Well, I think you- I don't think you have to write that to address whether this totality of facts and circumstances was a scheme that had the effect of market manipulation. I think you have to say that, Judge Loken, because tellingly the government- we may have to respectfully agree to disagree on this, but I think that when you look at the government's allegations with regard to what constitutes the market manipulation, leaving aside all of its allegations concerning the so-called bonus payment- over the government's allegations or even its arguments- But what you should fret about, I would respectfully- The instructions certainly. Well, and what you should- The instructions define the case the jury decides. Correct. You should fret about that, but you should also fret about whether the factual allegations constitute market manipulation, whether they establish materiality as a matter of law. And I would respectfully submit that the problem for the government- and you can ask Mr. Thompson this when he gets up here- is that they do not have a case even remotely resembling this type of conduct. The cases on which- What about Schermetta's testimony? I think I'm saying his name correctly. Where he said that these were not purchases that made financial sense for me or for my clients, and I was directed to do this by your client. Doesn't that suggest that perhaps the price was not what the buyer wanted? I think at most it suggests, Judge Kelly, that perhaps Schermetta would not have transacted if Mr. Gilbertson had not urged him to transact. And that would be no different than if a corporate executive, say, called up a friend and said, look, I really- it would be great if you would invest in my company. But is that the testimony? Is the testimony, oh, just, hey, here's a great stock. Why don't you buy some? I understood, and maybe you can correct me if I'm wrong, but I thought the testimony was a little stronger than that, that it was a direction to do something that he was not going to otherwise do. Yeah, well, even if it's a direction, I still think that the fundamental point is that what he did was to transact. And, of course, when you're determining whether there's market manipulation, you look at that from the perspective of the market. Is artificial information being communicated? What about the gifts in aid of this? There's gifts in effect to the insolvent coach if I have my players right. And there's gifts of stock to make it go. What about that? So on the sell side, it is certainly true that Mr. Hoskins obtained shares as a finder's opportunity as part of the reverse merger. The government does not argue that there is anything improper with shares being given to friends and family as part of a reverse merger. But the transactions on the sell side, if anything, would have had the effect of depressing prices, not increasing prices. There is no suggestion, as this case comes to the court, that there were somehow matched trades. These trades took place on the open market. And Judge Kelly— But is that open market? I'm sorry, go ahead. Well, I was going to get back to Schermetta's testimony because I think that the other aspect of Schermetta's testimony on which the government relies, and I do after this answer, I'd love to get to materiality and to restitution, but I think this is really critical for the court to understand. Schermetta testifies that he was told to purchase at $12. But these shares were being transacted on an open market. Dakota Plains was not Google. It was not being traded in the same volume as a massive public company. But it was being traded over the counter with a market maker. And so there is no way that somebody could come in and purchase above the market price. It would be like my telling a stockbroker, purchase Google shares at $1,000 if Google is actually trading at $500. You said maintain is part of the things that a manipulator can be doing. Well— Propping up a market at $12 can be manipulation, right? I think it has to be— I know you're going to say that's not what happened, but— Well, I have a legal answer to that as well, Judge Loken, which is that I think it has to be something more than that for the reason that I suggested to Judge Kelley. In other words, merely encouraging someone to buy can't be enough because, of course, as a matter of supply and demand, any purchase potentially has the effect of raising the price above what it otherwise would have been. That's just supply and demand. The government has to show something more than that. Again, that inaccurate or artificial information is being communicated to the market. And again, I don't think that the government has a case that stands for the proposition that merely encouraging someone to purchase when you have a profit motive would be improper because if that were true, any CEO who had stock options or whose compensation was tied to the stock price could be engaged in criminal securities fraud simply for encouraging a friend to invest in a company in which he or she believes. But if you combine that with his actions at the beginning with Hoskins where he's providing the money, Hoskins is the nominee, so no one knows at that point that it's Mr. Gilbertson. So when you combine those two, both at the front end and the back end, does that then put a different light on those purchases? No, because I think that the conduct on the selling side with regard to Mr. Hoskins can't be market manipulation, both for the reason that I gave Judge Benton, because it would have the effect of depressing the price, but also because the counterparty in an over-the-counter transaction doesn't know with whom they are trading. And indeed, the government, at page 49 of its brief, seems to concede that if Mr. Gilbertson had engaged in the trading, that that would be okay. But it's hard to see why that actually makes sense if the counterparty has no idea with whom he or she is trading. So why not do it yourself? It's Mr. Gilbertson. Well, Mr. Gilbertson testified, and of course the jury convicted him, but he testified that he was providing this opportunity to his friend. But I think the critical point is that to the extent the government's theory is that there was something nefarious about this transaction, they can't link that up to any sort of claim of market manipulation. Does Howell's testimony solve that? Solve. Howell's text message and testimony and, you know, Howell's role. I'm trying to help you on time. With regard, I'm sorry, I'm not following. Help us in what regard. No, I just was trying to say is Howell's testimony enough, are the text in his testimony enough to solve it and really make it both a fraudulent scheme and a cover-up? Well, I don't think so. And if anything, the fact that Howell himself testified in bold terms that this constitutes manipulation is, of course, our ground for arguing for, at a minimum, a new trial here because the Supreme Court has indicated that manipulation is a term of art. And I don't think that there can be any dispute that Howell's testified in bold terms that this was market manipulation on the sell side and market manipulation on the buy side. I don't think his testimony really adds anything other than to suggest that in Howell's view, Mr. Hoskins was essentially trading on Mr. Gilbertson's behalf. But again, that in and of itself can't constitute market manipulation. I see my time is very short, so I want very quickly just to say a couple of words on the issue of materiality and on the issue of restitution. On the issue of materiality, our submission is quite simple. The government presented no evidence that any misstatement or omission was material. And critically, this case went to the jury on the pages that I cited earlier on the theory that there has to be both market manipulation and either a misstatement or an omission. The government's theory at trial was clearly a theory of omissions. At page 2248 to 2249 of the transcript, they said, what we're talking about here is concealing material facts. And yet now on appeal, the government backs away from that, I think aware of the fact that if it's proceeding on an omissions theory, it has to show a duty either to the market or to the defendant. If the defendant controls half the shares, aren't we close to materiality right off the bat? No, I don't think so because this is not simply a case in which the jury was charged on pure market manipulation. The government has to identify either an omission, which requires both materiality and a duty, or an affirmative misrepresentation. The government now seems to proceed on a misrepresentation theory, but none of the misrepresentations that they're referring to have anything to do with the market at all. And the government made no effort, even when it was examining customers who purchased shares, to establish the element of materiality. And this court has made quite clear that the government cannot rely on inference or speculation to establish materiality. And the last thing I would say on the issue of restitution, which is obviously independently a very important issue to my client, is that the restitution award here cannot stand because under the MVRA, restitution has to flow from the criminal conduct that occurred in the course of the fraudulent scheme. The Supreme Court has indicated in the Huey case that criminal conduct has to be the crime of conviction. And it is quite clear that the jury convicted here on the basis of the scheme of market manipulation. And notwithstanding the government's late-breaking efforts to argue that the inclusion of the so-called bonus provision was part of the fraudulent scheme, the court has to look at the crime of conviction. And here, if you look at the crime of conviction market manipulation, the restitution amount, the amount of the renegotiated bonus provision does not causally flow from that criminal conduct. And I reserve my remaining 55 seconds for rebuttal. Thank you. Mr. Thompson? Thank you, Your Honors. May it please the Court, Joe Thompson on behalf of the United States. Your Honors, there was sufficient evidence for a reasonable jury to convict the defendant of both wire fraud and securities fraud. In this case, the defendant secretly rigged the price of Dakota Plains stock in order to inflate and prop up the stock price and trigger a bonus payment. The defendant didn't raise the price. I mean, let's stick with market reality here. He attempted to. He attempted to prop it up and maintain it. Maybe the effect of his actions, but you start out with what to me is a great misstatement, suggesting that this wasn't a publicly traded stock. It was a publicly traded stock, Your Honor. So the market maker and the market set the price. That's not. If you look at the evidence presented at trial, I don't think that's true. As the district court found, there was sufficient evidence for the jury to conclude that the defendant did actually increase the price of the stock, and he certainly maintained it. If you look at the trading records, if you look at what happened, Mr. Hoskins, the defendant's nominee, was the largest single seller of stock during the first 20 days of trading. He also controlled over half the float of the stock, half the freely trading shares, and the government presented expert testimony how this provided him an opportunity to have a massive effect on the price of the stock. Mr. Scimetta, the defendant's buyer, the stockbroker in Minneapolis at Northland Securities, was the largest single buyer of stock. And we know that when he purchased stock at or near $12 a share, he didn't do so because that was the prevailing market price. We know that because he testified to that. Well, why doesn't someone who's just a super short trader fall under your theory? A super short trader? Do you know what short trading is? I do. Good. Okay, so somebody just decided short trade, short trade, short trade, short trade, short trade, short trade. I think it's covered by your theory. There's no deception there. If Ryan Gilbertson had gone out and bought in his own name and there was a question about why didn't he do that, well, it's obvious why he didn't do that. Everyone would have known what he was up to. He was rigging and propping up the price. Is it fair to disclose the bonus as the key to your fraud case? It's part of it, but no. The key to the fraud case is the fact that there were a nominee buyer  He rigged the price of the stock by controlling the supply of the shares and directing Mr. Hoskins to sell at $12 a share and directing Mr. Scimetta to buy at $12 a share. He didn't tell Mr. Scimetta to buy at the prevailing market price. He told him, I wanted to trade at $12 a share. And Mr. Scimetta testified that when he purchased stock Well, that's what a limit order typically does. That's right. But it was a $12 limit, and I think it's notable that when Mr. Scimetta Well, okay, so now we've got So if I decide I'm going to make a limit order tomorrow, somehow I'm risking a fraud prosecution? Not at all. Not at all. Only if you are doing it in order to help someone rig and prop up the price of the stock by matching orders. And that's what happened. It's clear. Mr. Hoskins owed 50,000 shares of Dakota Plains stock. Mr. Scimetta's order on the second day of trading was to buy 50,000 shares at $12. That's rigging the price, and that's what he was doing throughout. Mr. Gilbertson himself bragged about it in a text message. He bragged that the stock would be trading at $7 a share, not $12, if not for my involvement. And I think it's important to note, Your Honors, that when we look at the evidence after a trial and after a conviction, we view it in the light most favorable to the verdict. And both the jury who heard the evidence and the district court who affirmed the conviction under Rule 29 and concluded himself personally that he had no doubt that the defendant had manipulated the price of the stock and committed fraud, viewed all of this as fraudulent and manipulation. I would note more, if you look at the stock price after the 20 days, what happened is instructive here. After the 20 days, trading effectively stopped. Mr. Hoskins started slowly dropping his sell price and selling the stock for lower and lower, and the price dropped over time. Mr. Scimetta stopped buying altogether. Well, that tends to happen, particularly after an IPO bump, and all of a sudden reality sets in, or the first piece of bad news comes in, and the stock reacts accordingly. And so the people that were selling at the top want to keep selling as it goes down so they get out. I know there's more to the case in the evidence, but the way you describe fraud is scary. Your Honor, I don't think it is. I don't think if you look at what Mr. Gilbertson did and how he did it, how he acted deceptively and concealed what he was doing, I don't think it's controversial, but I think this is legal. This is a far cry from a CEO who has some sort of... How was he going to disclose to the public buyers and sellers the bonus arrangement? First of all, was it in public? It was opaque, but it was in the AK. So now we don't have a failure to disclose. We have someone who mistakenly or maybe intentionally didn't do a very good disclosure. But the information was available to public buyers and sellers, right? The information about the bonus, yes. Not the information about the concurrent condition that he, his buyer, be able to acquire the 50,000 shares. It's important if you look at Government Exhibit 180. I think a public buyer, an investor of any sophistication who is aware of the bonus arrangement in the first days of trading would assume that there are insiders who would like to bring the bonus home, so to speak. Or something. Some great, if not a bonus, some great benefit. And that's why Mr. Gilbertson went to such extraordinary lengths to hide his control over the selling and the buying of the shares. What's the extraordinary length vis-à-vis the public investors that the securities law protect? By acquiring the float secretly? That was not... He wanted that transaction with Mr. Hoskins to be strictly confidential. As between whom? Between him and the people in Utah and the market maker who arranged the purchase of the shares. And it's important to note that on the day that he proposed the reverse merger, October 23rd of 2011, Mr. Gilbertson proposed the reverse merger agreement and he amended the terms of the bonus provision to apply not just to an IPO, but also to a reverse merger. And he proposed that to a new board of directors in their very first meeting. That same day he reached out... And they approved it, right? They did approve it. Okay, proceed. They did approve it. That very same day, and this is what they didn't approve, Judge Benton, that very same day he sent a text message, it's government exhibit 404-A, to Mr. Huddles and said, I'm ready to proceed with the reverse merger. They talked that day or the next day and Mr. Huddles testified about what they talked about. Mr. Gilbertson said there was a condition to this reverse merger and that was that buyers of his choice would be able to acquire 50,000 shares, which was more than half the float. He told Mr. Huddles, buyers of his choice, he did not tell Mr. Huddles that it was him. And Mr. Huddles testified he didn't know that. And then Mr. Gilbertson went to great lengths to hide it. He arranged for his friend and polo coach, Mr. Hoskins, to open up an account at a brokerage in Salt Lake City. He lied on those account opening documents. He wired Mr. Hoskins money to pay for the shares to hide his involvement in it. He had Mr. Hoskins lie on share purchase agreements, purchase agreements that Mr. Gilbertson himself edited. Well, doesn't the use of a nominee, that sort of hiding is inherent in that? That's right. Use nominees. And there's nothing illegal about using nominees. There's nothing inherent. That's like many fraud schemes. The individual steps may not themselves be illegal, and they don't have to be. The question is, are you taking actions to misrepresent or actively conceal things in a fraudulent way? And Mr. Gilbertson certainly did that step by step. The share purchase agreements themselves had a provision where Mr. Hoskins affirmed that he was not acting in concert with anyone. Whose intent was relevant to Gilbertson's conviction? All of his. Obviously his intent. His co-conspirators as well. If he did, is Hoskins' sleaziness relevant to Gilbertson's intent, fraudulent intent? Insofar as they work together, yes. Well, wait a minute. So everybody in your law firm, if you were in private practice, his actions are you're responsible for as a matter of mens rea. No, not at all, Your Honor.  No, I'm not, Your Honor. Did you have a conspiracy charge? We did have a conspiracy charge. Was it submitted to jury? It was, and they were convicted on it. Who said they that were convicted? Mr. Gilbertson was convicted on it. Okay. I would point out, Your Honor, that those share purchase agreements, if you look at the evidence, Mr. Gilbertson was arranging this transaction. He was filling out these forms. He was editing them. He was making the false statements, not Mr. Hoskins, who by all accounts knew nothing about trading, had nothing to do with it. Mr. Gilbertson then reached out through Mr. Hoskins to Mr. Hoskins, the market maker, his broker. Every step of the way, Mr. Gilbertson was doing this stuff. He was committing the fraud, and under the jury instructions it's important to note that Mr. Gilbertson himself doesn't have to make the misrepresentation. It just has to have caused it to be made, and he certainly did that. He was the one that arranged these transactions. Could you address the materiality issue on the two counts, the act of concealment, deliberate and permanent misstatement? Tell me your theory. What's the best theory, and what's material there? The materiality is his ownership of the shares and his control over the shares in the manipulative trading.  The act of concealment, yes. How is that material? It's material to the whole. I think there's lots of evidence showing it's material. It's material because you had someone fraudulently rigging the price of a stock and propping it up through both Mr. Hoskins and Mr. Scimetta. But what's the omission or false statement? On every one of the— You say, okay, what's material control of the shares? Where's the omission or misstatement there? The misstatement and the concealment is that Mr. Hoskins owns the shares, and the false information that's being created in the market is that— So not disclosing a nominee is fraud, you say again? No. If you're actively concealing something to commit fraud, yes. Actively concealing. I mean, you're great on the adjectives and adverbs, but where's the fact that distinguishes this from what countless investors do in the marketplace nearly every day? That countless investors in the market every day are buying stocks to profit, not to defraud. And that's a distinction here that's clear. This false information and the material information is the idea that a stock— They're always seeking losses too, counsel, just so you know. You say people do the market to profit. They do it to seek losses too. That's right. Trust me. And short-selling is a totally valid thing, and this does not— The government's theory is a far cry from short-sellers openly in the market trying to short-sell a stock so it drives down to profit. This is totally different. Mr. Scimetta did not value the stock at $12 a share, and that was false information that was conveyed to the market when he bought. Mr. Scimetta himself lied to his clients. He was buying on their accounts. They didn't know about it to the extent they did know about it. Neither side offered any market experts or economic experts, right? We did have an expert testify about manipulation, yes. What expert did you have? Professor Thiel, one of the government's first witnesses, talked about that. And on the manipulation, you say your expert testified about that. Why wasn't it error to have a lay witness talk about manipulation on the sell side, the buy side? That is a real term of art here. It's throughout the jury instructions in terms of what the jury has to determine really went on here. Were these legitimate trades or was this manipulation? How is that not error? Because Mr. Howells was doing nothing more than interpreting a conversation to which he was a party. But using a legal conclusion to do so. Yes, but he wasn't offering a legal opinion. This is far from the SCOP case cited by the defense. In that case, there was an SEC expert who testified without any personal knowledge of the case that there had been market manipulation and then the defendants had done it. That's not what Mr. Howells did. He testified about the text message conversation and oral conversations that he had with the defendant and what he did in reaction to those conversations and the back and forth. That's what he did. I would note also, Your Honor, that the defense did not object to them Well, they've got several objections scattered in there. You've seen them. They have objections to one part of it, not the rest. But either way, Your Honor, it's not error. It's well established that co-conspirators and witnesses can testify and interpret and offer their interpretations about conversations to which they were a party. They can also testify to their own bad actions. And that's what Mr. Howells did. He testified to what he did at Mr. Gilbertson's direction. I see we have a minute left. So I'll talk briefly about restitution. We're going to go to my question on restitution. Please, Your Honor. Why is the defendant's gain, the bonus, the proper measure of Dakota Plains restitution given our cases that carefully distinguish fraud laws for sentencing purposes and restitution, which has to be measured by the loss to the victim? That's exactly what happened here. The guideline's loss was the full $32 million of the bonus. The restitution amount is a much smaller figure because the amount that the company actually paid out was significantly less than that. But what was the measuring value? What was the value basis for the restitution? The entire amount of the bonus that was ultimately paid out to the defendant. And it was paid out in a combination of cash and stuff. Where is the proof at sentencing that that was lost to the victim? The proof at sentencing was that there would have been no bonus paid out at all but for the scheme. But that doesn't mean there was loss to Dakota Plains. I mean, you'd need a lot of financial experts to go from point A to point B on that one. The mathematical calculation of the restitution was not in dispute, Your Honor. That's the amount that was paid out on the bonus. It wasn't the full $32.8 million. It was renegotiated and paid out through a combination of cash and stock. Where is the evidence that it was lost to Dakota Plains? Because the company paid it out. That was the money that they paid out on the bonus. A lot of it was paid out in stock and there was a calculation about the value of the stock, a conservative calculation. If there was equivalent value to move to the bankruptcy world, there wasn't loss. Your Honor, I see my time is up. May I respond? Yeah, because I think this is a serious problem here. This is my response, Your Honor. The mathematical calculation was not in dispute. The full amount of bonus was $32.8 million. That was the intended loss for guideline purposes. The $15 million figure is the amount the company ultimately paid out. Mr. Gilbertson agreed to reduce the size of the bonus in light of threatened investor lawsuits and the anger in the investment community. It was paid out ultimately in a combination of cash and mostly stock. There was a calculation about the value of that stock. It was valued at $2.15 a share, which is a very conservative estimate. But the latest renegotiation, it was renegotiated twice. There was no dispute as to that math. The value of the stock in the public market does not equate to a gain or loss for the issuer. It did at that point because it was diluting its investor base. Absolutely, Your Honor. That company could have otherwise sold that stock. Who do I read for this wonderful economic theory? That a company can sell its stock. No, I mean in the record. There was testimony. Based on the trial testimony and there was basically nothing at sentencing about it? That's right, Your Honor, because the mathematical issue wasn't in dispute. That's why there wasn't testimony. The parties submitted calculations. Have you never read our case law on restitution? I have not. The value of the loss to victims is always in dispute and at issue. At this point, it was as a matter of what theory on which to calculate it. But once the court established the theory, the parties agreed as to the math matter. The mathematical matter was in issue. What theory? That the full amount of the bonus that was— The actual loss to Dakota Plains because they paid it out? Yes, that's right. The ultimate amount that the company paid out is loss. We need better economic education of our legal community then. Your Honor, the parties agreed to proceed without a hearing because as a mathematical matter, the calculation of the value of the bonus wasn't in dispute. Thank you, Your Honor. Your Honors, I would respectfully submit that the government's theory of market manipulation is even less clear now than it was from their brief. Mr. Thompson advances two arguments today, neither supported by a single case. First, he focuses on the alleged coordination on the sell side and the buy side. But at page A19, the district court rejected a matched trades theory, and for good reason. The evidence of price movements during the relevant 20-day period indicates that on the sell side and on the buy side, Hoskins and Schermetta, in fact, didn't even trade together on a majority of the 20 days. And in fact, traded in the same number of shares only on two of those 20 days. And so there really isn't factual support for that proposition. Mr. Thompson says that Schermetta traded at $12. That's not quite correct. When Schermetta put in his trade in response to the alleged call from Mr. Gilbertson, that trade was a market order. It was an order to trade at the market price, not some inflated price. And that's page 1105 of the transcript. Now, second, the government relies on this nominee theory. And in fact, I think that's really the core of the government's argument now. And Mr. Thompson talks at great length about the circumstances of Hoskins' application to his brokerage firm to open an account and the like. But the fundamental problem is that Mr. Thompson once again concedes that it would have been perfectly okay for Mr. Gilbertson himself to trade. And he makes no argument that the counterparty would somehow be privy to the identity of the party with whom it is trading. And if that is true, there simply cannot be market manipulation. And there also cannot be materiality. Can I say one last sentence, Judge Loken, because I think this is important? On materiality. It's all important, and it's also thoroughly briefed. Okay, thank you. I was simply going to point to the fact that the omission on which he relies is that. Thank you.